**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL COZZI, *et al.*,        ) | |
|       ) | |
|      Plaintiffs,     ) | Case No. 21-cv-998 |
|       ) | |
| v.          ) | Hon. Steven C. Seeger |
|       ) | |
| VILLAGE OF MELROSE PARK, *et al.*,  ) | |
|       ) | |
|      Defendants.    ) | |

## MEMORANDUM OPINION AND ORDER

The Village of Melrose Park decided that it would be a good idea to issue 62 tickets to an elderly couple for having lawn chairs in their front yard. The Village issued ticket after ticket, imposing fine after fine, to two eighty-year-old residents, Plaintiffs Vincent and Angeline Cozzi.

The fines were not small potatoes. Each ticket cost $500, so the Village tagged them with fines totaling about $30,000. And when it was all said and done, the Village slapped them with a lien on their house, for good measure.

The tickets faulted the Cozzis for creating a nuisance and for "unsanitary conditions." The tickets did not explain what was unsanitary about the plastic lawn chairs. But the Village claimed that they were receiving anonymous calls about "clutter" on their front lawn.

The Cozzis, for their part, didn't view their lawn furniture as wasteful clutter. In fact, they regularly used the furniture to sit outside, and visit with loved ones in a socially distanced manner during the pandemic. The fresh air and companionship apparently cost them $30,000.

A reader might be wondering how things could have gone so dramatically off the rails. The Village of Melrose Park, it seems, reacted poorly when Plaintiff Michael Cozzi (the adult son of Vincent and Angeline) complained about the first two tickets, and about the mistreatment

of his parents more generally.  Michael Cozzi attended public meetings in Melrose Park, and he expressed his concerns on social media about the Village harassing his elderly parents.

That free expression led to an avalanche of tickets.  The Village issued the Cozzis a $500 ticket nearly every business day from December 3, 2020 to March 3, 2021.  Christmas Eve was no exception.  The tickets would financially cripple the Cozzis, an elderly couple on a fixed income.

The retaliation stretched beyond the tickets.  Michael Cozzi received a handwritten note from a police officer warning him about supposed parking violations.  Several parking tickets soon followed.

And that's not all.  The police surveilled the home several times a day.  Michael Cozzi received threatening text messages from unknown or restricted phone numbers.  Someone broke his car window.  And on one occasion, the Mayor of Melrose Park, Ronald Serpico, drove by and verbally threatened Michael Cozzi with violence.

If the reader is thinking that things have, at this point, gone completely off the rails, buckle up, because the ride is not yet over.  In January 2021, as the deluge of tickets rained down, Michael Cozzi went to a public meeting at the Village of Melrose Park to express his concerns.  The meeting, it turns out, was recorded.  And to put it mildly, Mayor Serpico responded poorly.  He unleashed what can only be described as a filthy, profanity-laden tirade with racial overtones.  He told him where to go, and then some.

The Village told the Cozzis where to go, but they went to the federal courthouse instead. They filed a six count complaint against the Village and Mayor Serpico, bringing an assortment of federal and state law claims.  They allege that the Village and the Mayor violated their right to

equal protection, due process, free speech, and so on. The tidal wave of tickets mysteriously came to an end on March 3, a few days after service of process.

Defendants moved to dismiss a few of the claims. For the reasons stated below, the motion is granted in part and denied in part. But most of the complaint survives.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Plaintiffs Vincent and Angeline Cozzi were lifelong residents of Melrose Park, Illinois. *See* Second Am. Cplt., at ¶ 11 (Dckt. No. 40). They lived with their son, Plaintiff Michael Cozzi, who acts as the couple's caregiver. *Id.* Sadly, this Court recently received word that Vincent Cozzi, the father, passed away from COVID-19.

In 2019, Vincent and Angeline moved into a new home in Melrose Park. *Id.* at ¶ 12. As part of the move, the couple placed six outdoor plastic lawn chairs in their front yard. *Id.* Like many Americans, Vincent and Angeline enjoyed sitting outside and watching the world go by. *Id.* at ¶ 13. The docket includes pictures of them sitting in their front yard, enjoying the sunshine. *Id.*

At some point, according to the Village, other homeowners complained about the Cozzis' property. The Mayor's office purportedly received four phone calls about "clutter" on the Cozzis' lawn. *Id.* at ¶ 18. One call was by a former owner of the home – who no longer lived in the Village – while the other three callers were "anonymous." *Id.* at ¶¶ 19, 23.

3

On August 5, 2020, two officers with the Village of Melrose Park Department of Code Enforcement arrived at the Cozzi residence, accompanied by a Sergeant from the police department. *Id.* at ¶ 30. They handed Michael two tickets. *Id.* at ¶ 26. The tickets cited Vincent Cozzi for creating "nuisances" and "unsanitary conditions" on the property. *Id.* at ¶¶ 27–29. They were $500 each. *Id.*

The tickets did not explain how Vincent created a nuisance or any unsanitary conditions. *Id.* at ¶ 28. According to the Cozzis, the two officers told Michael that the tickets "are from the Mayor, not us." *Id.* at ¶ 26. Less than a month later, the Village of Melrose Park dismissed the tickets, after Michael put the chairs away. *Id.* at ¶ 34.

Michael tried to forestall future violations by reaching out to Village officials in the Department of Code Enforcement, without success. *Id.* at ¶ 35. They did not give him the time of day. *Id.* at ¶¶ 36–40. Friends had no luck reaching out on his behalf, either. *Id.* at ¶ 40.

Around November 2020, the Village supposedly received more "anonymous" phone calls about the "clutter" in the Cozzis' front yard, including lawn chairs and Halloween decorations. *Id.* at ¶ 41. In reality, the complaints were exaggerated, or fabricated altogether. *Id.* at ¶ 122.

At some point (the complaint does not reveal when), Michael Cozzi started speaking up to draw attention to the mistreatment of his elderly parents. He began attending public meetings at the Village. *Id.* at ¶ 46. And he expressed his concern on social media, too, by posting Facebook videos. *Id.*

Things went from bad to worse. According to the complaint, the Village "began a concerted campaign to bully, harass, and retaliate against them for asserting their constitutional rights." *Id.* at ¶ 47. The harassment and retaliation included "repeatedly issuing Plaintiffs tickets, ringing their doorbell to deliver tickets on Saturdays and Sundays, leaving warning notes,

4

improperly surveilling and patrolling Plaintiffs' house, putting a lien on their property, and threatening Michael with physical violence." *Id.* at ¶ 48.

The next wave of harassment came in early December, when the Cozzis decorated their front yard for Christmas. *Id.* at ¶ 49. On December 1, the same two Code Enforcement officers approached the home and told Michael to "put the clutter away" because their "boss" received several anonymous complaints. *Id.* at ¶ 50. The officers mentioned the lawn furniture, as well as a political sign, a political flag, and Halloween and Christmas decorations. *Id.*

Michael explained that his parents used the chairs to have socially distanced company over during the COVID-19 pandemic. *Id.* at ¶ 51. The officers accepted his explanation and left, without issuing any citation. *Id.* at ¶ 52.

On December 3, the Village started issuing the Cozzis $500 tickets. *Id.* at ¶ 62. The citations were, again, for apparent "nuisances" and "front lawn clutter," in violation of the Village's municipal code. *Id.*

The Cozzis received "near-daily" citations for these "nuisances," including Christmas Eve. *See* Second Am. Cplt., at ¶¶ 44, 65 (Dckt. No. 40). They received tickets on December 3, 7, 8, 9, 10, 11, 14, 15, 16, 17, 18, 21, 22, 23, 24, 28, 29, 30, 31, and on January 4, 5, 6, 7, 8, 11, 12, 13, 14, 15, 19, 20, 21, 22, 25, 26, 27, 28, and on February 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 16, 17, 18, 19, 22, 23, 24, 25, 26, and on March 3. *Id.* at ¶ 63. That's 57 tickets.

Many of the tickets have sequential numbers, suggesting that no one else in the entire Village received a ticket in the meantime. For example, the Cozzis received ticket #4451 on December 8, ticket #4452 on December 9, ticket #4453 on December 10, and ticket #4454 on December 11. *Id.* at ¶ 77. They received ticket #4457 on December 14, ticket #4458 on

December 15, ticket #4459 on December 16, ticket #4460 on December 17, and ticket #4461 on December 18. *Id.* And so on.

The fact that the Village wasn't ticketing anyone else wasn't for lack of opportunities. The complaint is chock-full of pictures of other houses in the neighborhood. *Id.* at ¶ 133. The surrounding lawns are adorned with used mattresses, a 15-foot skeleton with a Santa hat, garbage, and trampolines. *Id.* There are reindeer, swans, candy canes, stars, pergolas, tchotchkes, and Christmas decorations at various degrees of garishness. *Id.* Not to mention plenty of lawn furniture. *Id.*

What were those lawns missing? *Tickets.*

Oftentimes, Code Enforcement officers from the Village hand-delivered tickets to the Cozzis at their front door. *Id.* at ¶ 79. But after Michael Cozzi posted a video of the officers coming to their home, the tickets started arriving in the mail. *Id.*

Tickets for supposed parking violation soon followed. In December, the Mayor's office allegedly received complaints about parking violations on the Cozzis' street. *Id.* at ¶ 54. Before long, Michael Cozzi found a "warning" note from a police officer on his windshield. *Id.* at ¶ 55. The note included a shot across the bow, letting the Cozzis know that "the Mayor" had received complaints about "you parking your car on 15th with your hazards on for period at a time." *Id.* "I was told" – by whom, the note did not say – "that if I see your car parked on 15th in violation, to issue a ticket." *Id.*

That warning proved prescient. From December 2020 to March 2021, the Cozzis received several parking tickets. *Id.* at ¶ 59.

The harassment deteriorated into threats of violence. On December 7, the Mayor of the Village of Melrose Park, Ronald Serpico, drove by the home of the Cozzis. *Id.* at ¶ 87. Mayor

Serpico slowed down, rolled down the windows, and got into a verbal altercation with Michael Cozzi. *Id.* at ¶ 88. It ended with a threat of violence from the Mayer: "You're lucky I don't get out of this car and beat your *ss." *Id.* at ¶ 89.

All of a sudden, Michael Cozzi started receiving threats on his phone. He received texts from unknown or blocked numbers. One text told him to get out: "Wait till I see you. I'm splitting your curly wig, you dead beat C*nt. This is my neighborhood; you best get the f*ck out before we make you get out." *Id.* at ¶ 93.

Another text – from a restricted number – threatened to kill him. And it threatened his elderly parents, too:

> Listen, you sheep head motherf*cker. I'm going to put a piece in the back of your motherf*cking skull. I'm going to f*ck your mother and your father.
>
> Get the f*ck out of Melrose Park before you catch a f*cking beating. Do you understand me, you f*cking c*nt motherf*cker?
>
> Do you have any idea who the f*ck you're f*cking with?
>
> You'll be dead, you motherf*cker. I'm telling you one time. Last f*cking time I'm going to call you, you piece of sh*t c*nt motherf*cker.

*Id.* at ¶ 94.

All the while, the tickets continued to rain down. The Cozzi family received ticket after ticket, day after day, fine after fine.

In January 2021, Michael Cozzi attended a public meeting in Melrose Park. *Id.* at ¶¶ 96–101. Mayor Serpico presided. *Id.* at ¶ 96. Michael Cozzi approached the podium to express his concerns about the treatment of his elderly parents. *Id.* at ¶ 97.

Before he could speak, Mayor Serpico tore into him. *Id.* at ¶ 99. Mayor Serpico unleashed an expletive-laden tirade, complete with vulgar and racially offensive language. The

language was about as profane as it gets – he used the "f-word" over and over, as a noun, a verb, and an adjective. *Id.* at ¶ 100.

It was recorded. *Id.* at ¶ 102.

Things didn't improve from there. In February 2021, the Village directed the Cozzis to appear at an administrative hearing for a prove-up of a batch of the tickets. *Id.* at ¶ 114. They needed to appear "in person," in the midst of the pandemic. *Id.* at ¶¶ 110, 112, 114. Vincent and Angeline were not able to participate in person, given their age and their poor health, especially in light of the pandemic. *Id.* at ¶¶ 112–13. (As an aside, recall that the vaccine was not widely available to members of the public in February 2021.) So Michael Cozzi attended the hearing and requested a continuance. *Id.* at ¶ 115.

The hearing officer for the Village denied that request. *Id.* at ¶ 116. The hearing officer then issued a default judgment for more than 31 tickets, even though the Village presented no evidence. *Id.* at ¶ 117. When Michael Cozzi objected, Village employees tried to remove him from the room. *Id.* at ¶ 118.

The very next day, the Village sent the Cozzis a letter, letting them know that the Village had placed a lien on their home based on the tickets. *Id.* at ¶ 123. The lien totaled $15,500. *Id.*

Michael Cozzi filed a FOIA request for copies of the "anonymous complaints" in connection with the Cozzis' home. *Id.* at ¶ 120. On February 3, the Village responded that it had "no documents that were responsive." *Id.* at ¶ 121. For whatever reason, the complaints couldn't be found.

On February 22, 2021, in the midst of the torrent of tickets, the Cozzis filed this lawsuit. *See* Cplt. (Dckt. No. 1). Two amended complaints followed. *See* First Am. Cplt. (Dckt. No. 14);

Second Am. Cplt. (Dckt. No. 40). The second amended complaint includes six claims against the Village of Melrose Park, two of its departments, and Mayor Serpico.

The first four claims are constitutional claims, including equal protection (Count I), due process (Count II), free speech and free exercise of religion (Count III), and free speech (Count IV). The first free speech claim (Count III) is about the political flag, the political sign, and the Christmas decorations. The second free speech claim (Count IV) is about retaliation against the Cozzis for speaking up about their mistreatment.

There are two other claims. Count V is a claim by Vincent and Angeline Cozzi against the Village and two of its departments for violating the Illinois Administrative Review Act by not giving them a fair hearing to challenge the tickets.[1] *Id.* at ¶¶ 181–201. Count VI is an indemnification claim against the Village for the actions by Mayor Serpico. *Id.* at ¶¶ 202–03.

All three members of the Cozzi family bring each claim, except Counts II and V which are brought by the parents (only). Those claims involve a challenge to the tickets themselves, and the tickets were issued to the parents only.

The filing of the lawsuit seems to have stopped the flow of tickets. The Village received service of process on February 26, 2021. *See* Proof of Service (Dckt. No. 8). Within a week, the string of tickets finally came to an end. The last ticket is dated March 3. *See* Second Am. Cplt., at ¶ 63 (Dckt. No. 40).

All told, between December 3, 2020, and March 3, 2021, the Village issued the Cozzis at least 62 tickets. *Id.* at ¶ 62. At $500 a pop, that's a bill of about $30,000. *Id.* at ¶¶ 62, 63, 69.

---

[1] The administrative record is on the docket. *See* Administrative Record (Dckt. No. 35). It includes pictures of the tickets, the political signs, and the lawn chairs. It includes copies of the orders from the hearing officer, too.

As an aside, there is some wiggle room in the complaint about how many tickets the Cozzis received. Several paragraphs of the complaint allege that the Village issued at least 62 tickets. *Id.* at ¶¶ 1, 62, 135, 136. Another paragraph includes a picture of a spreadsheet, which shows two tickets in August, plus 57 tickets for lawn clutter from December 2020 to March 2021, for a total of 59 tickets. *Id.* at ¶ 63. Other paragraphs refer to "numerous" and "several" parking tickets. *Id.* at ¶¶ 1, 59, 107. The precise number does not matter at this stage. The key point is that the Village issued dozens of tickets.

Some of the tickets were later dismissed. *Id.* at ¶ 192. Defendants later confirmed that they dismissed 27 tickets on March 2, 2021. *See* Pl.'s Statement, at ¶ 4 (Dckt. No. 18). That's about a week after service of process.

But by all indications, the lien is still in effect. So is the final judgment for the 31 tickets totaling $15,500.

The Village and Serpico now move to dismiss Count II (the due process claim), a portion of Count III (the free exercise claim about the Christmas decorations), and Count IV (the First Amendment claim against the Village). *See* Defs.' Partial Mtn. to Dismiss (Dckt. No. 46).

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

## Discussion

### I.  Due Process (Count II)

The first claim is about due process.  Vincent and Angeline Cozzi claim that the Village of Melrose Park and Mayor Serpico violated due process by issuing bogus tickets, and then not giving them a fair opportunity to challenge them.

The claim focuses on the hearing that took place on February 2, 2021.  Michael Cozzi attended, but his elderly parents could not attend because of their age and health.  The hearing officer entered a default judgment against them.  *See* Second Am. Cplt., at ¶ 117 (Dckt. No. 40).

As the Cozzis see it, the hearing went completely sideways, and the hearing officer failed to follow state procedure in lots of different ways.  The Cozzis basically claim that they got railroaded in violation of the Due Process Clause.

Plaintiffs bring a constitutional claim against the Village, so *Monell* applies.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  A municipality is responsible for its own conduct, and *only* its own conduct.  *Id.* at 694.  Respondeat superior is off the table.  A plaintiff must prove that a governmental "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," caused the constitutional violation. *Id.*; *see also First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) ("[T]o prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself.").

But before holding a municipality responsible, there must be something to hold the municipality responsible *for*. That is, "the plaintiff must begin by showing an underlying constitutional violation, in order to move forward with her claim against the municipality." *See Schor v. City of Chicago*, 576 F.3d 775, 779 (7th Cir. 2009); *see also First Midwest Bank Guardian of Est. of LaPorta*, 988 F.3d at 987 ("These principles are settled and familiar. So too is the requirement that the plaintiff must initially prove that he was deprived of a federal right. That's the first step in every § 1983 claim, including a claim against a municipality under *Monell*. A *Monell* plaintiff must establish that he suffered a deprivation of a federal right *before* municipal fault, deliberate indifference, and causation come into play.") (emphasis in original). Without an underlying violation, it does not matter whether the municipality itself is to blame.

Under the Fourteenth Amendment, no state shall "deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1. "A procedural due process claim requires a two-fold analysis. First, we must determine whether the plaintiff was deprived of a protected interest; second, we must determine what process is due." *Pugel v. Bd. of Trs. of Univ. of Illinois*, 378 F.3d 659, 662 (7th Cir. 2004); *see also Bradley v. Village of Univ. Park*, 929 F.3d 875, 882 (7th Cir. 2019) ("The basic legal questions presented by due process cases like this are familiar: '(1) is there a property or liberty interest protected by due process; and (2) if so, what process is due, and when must that process be made available?'") (citation omitted).

The complaint alleges that the Village deprived the Cozzis of a protected interest. The Village tagged them with dozens of tickets, imposed thousands of dollars of fines, and slapped a lien on their house. So the question is "what process is due." *See Pugel*, 378 F.3d at 662.

12

Here, part of the claim focuses on the issuance of the tickets in the first place. *See* Second Am. Cplt., at ¶ 154(a) (Dckt. No. 40). But most of the claim takes issue with what happened at the hearing itself. The Cozzis allege that the Village deprived them of a "fair and impartial hearing" by (1) refusing to grant a continuance; (2) requiring an in-person appearance by an elderly couple during the pandemic; (3) failing to describe the alleged violation with specificity; (4) failing to issue a written order with findings of law; (5) failing to issue a decision based on the evidence; (6) failing to identify the complaining witnesses; (7) imposing a lien without a prove-up hearing and the requisite waiting period required by state statute. *Id.* at ¶¶ 153–54.

The complaint starts with the premise that a failure to follow state procedures is a violation of the Due Process Clause of the federal Constitution. But state procedures and federal due process are not perfectly coextensive. There may be some overlap – for example, both could require notice and an opportunity to be heard – but a violation of one is not necessarily a violation of the other.

A violation of state procedures is not *ipso facto* a violation of the Due Process Clause. *See Vargas v. Cook Cnty. Sheriff's Merit Bd.*, 952 F.3d 871, 874–75 (7th Cir. 2020) ("[An] state's failure to comply with its own law is not a federal due-process violation. Indeed, a state may *disregard* its own law without depriving a person of due process of law. This isn't a novel rule. It has been clear for decades that noncompliance with state law is not itself a deprivation of due process of law.") (emphasis in original); *Oesterlin v. Cook Cnty. Sheriff's Dep't*, 781 F. App'x 517, 522 (7th Cir. 2019) ("Due process is a federal standard, independent of any procedure guaranteed by state law . . . ."); *Simmons v. Gillespie*, 712 F.3d 1041, 1044 (7th Cir. 2013) ("The Constitution does not require states to ensure that their laws are implemented

13

correctly.").  An action can violate state procedures without violating the Due Process Clause.
And an action can violate the Due Process Clause without violating state procedures.

But the fact that a decision violated state procedures does not preclude a claim that it
violated the Due Process Clause, either.  They are not mutually exclusive.  *See Bradley*, 929 F.3d
at 880 ("'[J]ust as a violation of state law does not a constitutional claim make, so the [state law]
violation does not protect officials from the federal consequences of their otherwise-
unconstitutional conduct,' as Supreme Court precedent has 'establish[ed] the indifference of
constitutional norms to the content of state law.'") (capitalization added; brackets in original;
citations omitted).

The due process claim fails to the extent that it rests on a mere violation of state
procedural rights.  *See GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 366 (7th Cir.
2019) ("[T]here is no constitutional procedural due process right to state-mandated
procedures."); *Tucker v. City of Chicago*, 907 F.3d 487, 495 (7th Cir. 2018) ("[F]ederal due
process protection is not a guarantee that state governments will apply their own laws
accurately."); *Gryger v. Burke*, 334 U.S. 728, 731 (1948) ("We cannot treat a mere error of state
law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state
court on state law would come here as a federal constitutional question.").

The process that is "due" depends on the situation.  "Due Process, as this Court often has
said, is a flexible concept that varies with the particular situation."  *Zinermon v. Burch*, 494 U.S.
113, 127 (1990); *see also Vargas*, 952 F.3d at 874 ("Because the constitutional guarantee of due
process of law 'calls for such procedural protections as the particular situation demands,' its
content is variable rather than constant.") (citation omitted).

Sometimes a person is entitled to a hearing before the deprivation takes place. And sometimes a hearing after the fact is enough. It depends on whether the act in question was "random and unauthorized." *See Parratt v. Taylor*, 451 U.S. 527, 541 (1981).

Due process claims fall into two categories: "(a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Leavell v. Illinois Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010) (cleaned up). If a claim falls into the second bucket, then "the state's obligation under the Due Process Clause is to provide sufficient remedies after its occurrence, rather than to prevent it from happening." *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 535 (7th Cir. 2008). That is, "a claim based on random and unauthorized acts by state officials does not have the same predictability, and thus, only requires a meaningful post-deprivation remedy." *See Cannici v. Village of Melrose Park*, 885 F.3d 476, 479 (7th Cir. 2018). "When a state official deprives a person of his property through a random, unauthorized act that departs from state law, the federal due-process guarantee requires only that the state provide an adequate postdeprivation remedy." *Vargas*, 952 F.3d at 875; *see also Leavell*, 600 F.3d at 805 ("[F]or a plaintiff alleging a procedural due process claim based on 'random and unauthorized' conduct of a state actor, the plaintiff must either avail herself of state post-deprivation remedies 'or demonstrate that the available remedies are inadequate.'") (citation omitted).

The claim at hand falls into the second camp. The Cozzis aren't claiming that the Village of Melrose Park established procedures that inherently violate the Due Process Clause. Instead, they are claiming that Village failed to follow procedures and failed to apply normal rules in an unbiased manner.

The thrust of the claim is that the Village of Melrose Park was biased against them. But a claim about bias is a claim about random and unauthorized conduct. *See Calderone v. City of Chicago*, 979 F.3d 1156, 1165 (7th Cir. 2020) ("Calderone specifically alleges that the individual defendants acted out of 'negative animus' and 'bias' against her. This is not a challenge to the disciplinary procedures prescribed by municipal law. Rather, Calderone readily admits that she describes a series of 'random and unauthorized' departures from municipal law, resulting in the deprivation of her property interest in continued public employment."); *Vargas*, 952 F.3d at 875 (holding plaintiff's allegation that defendant "pressured Merit Board members to make biased decisions" qualified as a "random, unauthorized act"); *Cannici*, 885 F.3d at 480 ("Cannici's argument surrounding any potential bias of the Board is precisely the same unpredictable misconduct contemplated in *Michalowicz*. Thus, the district court's application of random and unauthorized acts by the Board was not erroneous."); *Michalowicz*, 528 F.3d at 534–35 ("[H]e claims he was denied due process because the Village allowed the Board of Trustees – which he maintains was biased against him – to conduct his hearing . . . . This species of due-process claim is a challenge to the 'random and unauthorized' actions of the state officials in question, i.e., to their unforeseeable misconduct in failing to follow the requirements of existing law.").

So the Cozzis need a post-deprivation remedy, meaning that they need an opportunity to challenge what took place. And they've got one. The Cozzis have a post-deprivation remedy under the Illinois Administrative Review Act. *See* 735 ILCS 5/3-101 *et seq.*

And in fact, the Cozzis are pursuing that remedy here. Count V seeks relief under the Act. *See* Second Am. Cplt., at ¶¶ 202–03 (Dckt. No. 40); *see generally City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997) (confirming that federal courts may exercise

supplemental jurisdiction over state administrative review claims when the state's action also gives rise to constitutional claims over which there is original jurisdiction).

The Cozzis don't lack a process to challenge what happened to them at the hearing. They're challenging it right here, right now, in Count V. That's a post-deprivation remedy, and that's enough for due process. They have a lane to challenge what happened, and they're already driving down it.

The Cozzis never argue that the post-deprivation remedy is inadequate, or otherwise fails to pass constitutional muster. In claims by public employees, the Seventh Circuit has "found time and again that the Illinois Administrative Review Act provides sufficient post-deprivation relief" for public employees to challenge random and unauthorized departures from state law. *See Cannici*, 885 F.3d at 480; *see also Leavell*, 600 F.3d at 805–06; *Michalowicz*, 528 F.3d at 534–36.

The same principle applies here. The Cozzis have an adequate post-deprivation remedy, so the due process claim fails. There is no due process claim because they have a process to challenge what happened to them at the hearing.

## II.     First Amendment Claim – Free Exercise (Count III)

Count III is a First Amendment claim, including the right to free speech and to petition the government for a redress of grievances. It covers the free exercise of religion, too, because the Village allegedly gave the Cozzis a hard time about Christmas decorations and lights.

Defendants moved to dismiss the free exercise portion of Count III. *See* Defs.' Partial Mtn. to Dismiss, at 7–9 (Dckt. No. 46). In response, the Cozzis dropped the free exercise portion of the claim. *See* Pls.' Resp. in Opp. to Defs.' Partial Mtn. to Dismiss, at 13–14 (Dckt. No. 56)

("Plaintiff voluntarily withdraws this portion of their complaint as it relates to the Christmas decorations and the free exercise clause.").

The portion of Count III that covered the free exercise of religion is dismissed without prejudice. The rest of the claim otherwise survives.

## III.    First Amendment Claim – Free Speech (Count IV)

Count IV is a First Amendment claim against the Village. The Cozzis alleged that the Village retaliated against them for exercising their right to free speech. As they see it, the Village punished them with 62 tickets and roughly $30,000 in fines when Michael Cozzi spoke up about the mistreatment of his elderly parents.

Again, under section 1983, a municipality is not vicariously liable for the actions of its employees. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Instead, a municipality is responsible for its own conduct only. That is, a "municipality cannot be held liable for the constitutional torts of its employees and agents. Accordingly, to prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself." *See First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021); *see also Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 674–75 (7th Cir. 2009) ("Monell liability is not a form of respondeat superior; instead, a municipality can only be held liable 'when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under section 1983.'") (quoting *Monell,* 436 U.S. at 694).

The Village is liable "only for violations of federal rights that occur 'pursuant to official municipal policy of some nature.'" *See Bradley*, 929 F.3d at 884 (citing *Monell*, 436 U.S. at

694)).  Three types of actions can give rise to municipal liability under section 1983:  "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority."  *See Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (quotation marks omitted); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).  The plaintiff also must establish "the requisite causation," meaning "the policy or custom was the moving force behind the constitutional deprivation."  *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (cleaned up).

The parties spill a significant amount of ink arguing about whether the complaint alleges a widespread custom or practice of violating First Amendment rights.  That's the second type of action that can give rise to liability under *Monell*.

There is a more direct road to get past *Monell*.  A municipality is responsible if "an actor with final decision-making authority within the entity adopted the relevant policy or custom."  *See Thomas v. Martija*, 991 F.3d 763, 773 (7th Cir. 2021).  A municipality is on the hook for a decision "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Monell*, 436 U.S. at 694.

In the case at hand, there is more than enough in the complaint to allege that the conduct originated with a person with final decision-making power.  Mayor Serpico wielded power on behalf of the Village, and he used it to impose a policy and practice of punishing the Cozzis.

When deciding whether an official is a final decisionmaker within the meaning of *Monell*, courts consider factors such as:  "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is

19

subject to meaningful review; and (3) 'whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.'"  *See Valentino*, 575 F.3d at 676 (citation omitted) (concluding that there was sufficient evidence that the mayor was the final decisionmaker when it came to retaliation for free speech).

"The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986). The key question is whether the official is the *policymaker*.  *See Valentino*, 575 F.3d at 675 ("But just because Owen is the *decisionmaker* on hiring/firing decisions for the Village government does not necessarily make him the *policymaker* on those issues.") (emphasis in original); *Kujawaski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 737 (7th Cir. 1999) ("[It is a] well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority.  There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire.").  "Officials with *final* decisionmaking authority are deemed policymakers for Monell purposes, and we need to look to state law to determine the scope of such authority."  *See Valentino*, 575 F.3d at 676 (emphasis in original).

Mayor Serpico holds considerable power in the Village of Melrose Park.  He is a "final policymaker and serves the president" of the Village.  *See* Second Am. Cplt., at ¶ 10 (Dckt. No. 40); *see also id.* at ¶ 180.  He has served as the Mayor for over 20 years.  *Id.* at ¶ 10.  He wields executive authority within the Village, and the Board "rubberstamps" his recommendations for ordinances.  *Id.* at ¶¶ 176–77.  The Board has rejected his legislative proposals (meaning ordinances) only twice in 24 years.  *Id.* at ¶ 158(c).  In short, he runs the town.

20

The complaint suggests that the person in charge of code enforcement is Mayor Serpico's lackey. The Mayor "recommends the appointment of the Director of Code Enforcement Division to the Board of Trustees." *Id.* at ¶ 158(b).

If this case were a *Monell* crime scene, the Mayor left his fingerprints, footprints, and DNA all over the place. Consider, for starters, the tickets about the lawn furniture. The Mayor's secretary allegedly received complaints about "clutter" on the Cozzis' lawn. *Id.* at ¶ 18. When the code enforcement officers delivered the first two tickets, they expressly stated that the tickets were "from the Mayor, not us." *Id.* at ¶ 26.

On December 1, 2020, two code enforcement officers came back to the home, right before the next wave of tickets poured down. They told the Cozzis that their "boss" had received complaints about clutter on their property. *Id.* at ¶ 50.

The issue with the parking tickets had a link to the Mayor, too. The "Mayor's Office" allegedly received complaints about how the Cozzis parked their cars on the street. *Id.* at ¶ 54. In early December, 2020, a police officer left a handwritten warning letter on the windshield of Michael Cozzi's car. *Id.* at ¶ 55. The note invoked the Mayor: "The Mayor has recieved [sic] several emails from residents complaining about your parking your car on 15th with your hazards on for periods at a time." *Id.*

Mayor Serpico personally participated in the surveillance of the Cozzis' home. *Id.* at ¶¶ 85, 87. And, in one particularly unfortunate episode, the Mayor tried to pick a fight with Michael Cozzi outside his home. *Id.* at ¶ 90. The Mayor told Cozzi to count his blessings for the privilege of not getting beat up: "You're lucky I don't get out of this car and beat your *ss." *Id.* at ¶ 89.

The toxicity increased when Michael Cozzi attended a public meeting at the Village in January 2021.  *Id.* at ¶ 96.  Cozzi intended to express his concerns to the Mayor about the treatment of his elderly parents.  *Id.* at ¶ 97.  He came to the meeting after attending other Village meetings, and after expressing his concerns on social media.  *Id.* at ¶ 46.

That's when Mayor Serpico completely lost it.  He lost his cool.  He lost his temper.  And if he has any ability to express himself without using expletives, he lost that too.

Mayor Serpico spewed the following missive:  "I'm going to tell you something, you're really reaching me.  So, do me a f*cking favor and sit down and shut the f*ck up.  How's that?  You little f*cking pr*ck.  Go on, shake your f*cking head.  You're nothing but a f*cking punk."  *Id.* at ¶ 100.

Michael Cozzi responded with a simple question:  "What did I do to you?"  *Id.*  That innocent question sent Mayor Serpico into the next stratosphere.

What he lacked in elegance – and in range of vocabulary – he made up for in directness:  "You're a jag off!  You look like a f*cking shine[2] on 15th [avenue] because you're doing it to bust f*cking balls.  That's what your doing.  So, go f*ck yourself.  Go f*ck yourself!"

Michael Cozzi then asked about his broken window.  *Id.*  That didn't go over well.

When it came to expletives, Mayor Serpico still had some gas left in the tank:  "I give a f*ck about your window.  Like I worry about your f*cking house when I drive past it.  Now do me a favor and go sit down and shut up."  *Id.*

At that point, one might have thought that Mayor Serpico had gotten his point across.  But the Mayor apparently thought otherwise. To cement the point, Mayor Serpico told him what

---

[2]  The word "shine" is a disparaging term for a black person.  It comes "from shoeshine, for the fact they often shine shoes for richer white folks."  Shine, Urban Dictionary, https://www.urbandictionary.com/ define.php?term=shine (last accessed March 21, 2022).  It was more common in the early 20th century.  *Id.*  But apparently, it is still part of Mayor Serpico's repertoire.

he really thought: "Yeah, because you live like a piece of sh\*t. You're like a f\*cking hillbilly. You're like a hillbilly!" *Id.*

Even by contemporary standards, such as they are, that outburst was an extraordinary display of profanity and aggression. It suggests a deep level of personal animus. And it shows a willingness to abuse one's position as a public servant. It was not the finest hour in the annals of public service.

The tirade may not have creative value, but it did have evidentiary value. Look again at the words that Mayor Serpico used. (And not just the profanity.) He told the Cozzis that they "live like a piece of sh\*t." *Id.* He said that Michael Cozzi lived like a "hillbilly." *Id.* He revealed both knowledge and contempt for how the Cozzis kept their home.

The meeting took place in January 2021, in the midst of the barrage of tickets about the lawn furniture. And the outburst came as Michael Cozzi attempted to express concern about the treatment of his elderly parents.

Reading the complaint as a whole, it takes a small step – not an inferential leap – to conclude that Mayor Serpico personally orchestrated the campaign of punitive tickets that rained down on the Cozzi family. *Id.* at ¶ 178 (alleging that Village personnel issued the tickets and impose the lien "at the behest of Serpico"). The complaint paints a picture of state-sanctioned bullying at the hands of the Mayor, who implemented a policy of punishing dissent and compelling compliance. Overall, the allegations support the inference that Mayor Serpico implemented a policy to punish, harass, and intimidate the Cozzi family.

In the end, the allegations of the complaint may or may not pan out. It depends on the facts, and the parties need to gather the facts in discovery. And it is possible that the evidence will support a *Monell* claim on the other prongs, too. That is, maybe the record will include

evidence of an express policy, or a widespread practice that is a custom or practice. But Plaintiffs would need to build a record.

That's a question for another day. Today's question is simply whether the complaint alleges enough to state a *Monell* claim. And by a wide margin, it does.

## Conclusion

For the reasons stated above, Defendants' motion for partial dismissal is granted in part and denied in part. The motion to dismiss Count II (due process) is granted. The motion to dismiss Count III (First Amendment) is granted to the extent that it involved a claim about the free exercise of religion. Count III otherwise survives. The motion to dismiss Count IV (a First Amendment claim against the Village under *Monell*) is denied.

Date: March 21, 2022

Steven C. Seeger
United States District Judge